## Commonwealth v. Joseph

*Mont L. Ailey,* for Commonwealth.

*H. A. Wilkison,* for defendant.

BRAHAM, J., January 15, 1937.—This case came on for trial before a judge without a jury, pursuant to the provisions of the Act of June 11, 1935, P. L. 319. By a general verdict filed this day we have found defendant not guilty. The act does not in terms require an opinion to be filed, but in the interest of justice it seems proper to explain the grounds for the court's finding.

The prosecution was brought under the Act of May 13, 1909, P. L. 520, known as the Pure Food Act, which makes it unlawful to "manufacture, sell, offer for sale, expose for sale, or have in possession with intent to sell, any article . . . which is adulterated or misbranded within the meaning of this act". There is a further provision: "for the purpose of this act, an article shall be deemed to be misbranded:

"First. If it be an imitation of, or offered for sale under, the name of another article.

"Second. If it be labeled or branded so that it may deceive or mislead the purchaser. . . .

"Third. If the package containing it, or its label, shall bear any statement, design, or device, regarding the substances or ingredients contained therein, which statement, design, or device shall be false or misleading in any particular."

We quote only the applicable portions.

The charge was that defendant had sold under the name "Plymouth Brand Bacon" an article which was not bacon. Admittedly the article sold was the flesh of the neck or jowl of the hog, cured according to a bacon formula. It was bought by H. H. Davis, senior food inspector for the Commonwealth of Pennsylvania, at the meat market of defendant in New Castle. It was wrapped in cellophane, having thereon a printed label reading "Plymouth Brand, trade mark, bacon, Armour and Company, general offices, Chicago. Made in U. S. A. Net weight .... lbs. .... ozs", and another label reading "U. S. inspected by department of agriculture, establishment 2B". According to the evidence this package, together with a number of similar packages manufactured by Armour and Company at Chicago, Ill., were delivered by that company to defendant.

The Commonwealth, after showing the purchase from defendant of the article in question, produced evidence to show that the article was misbranded in that, although it was labeled "bacon", it was not bacon. The evidence to

support such conclusion consisted of the evidence of one expert who testified that, in his opinion, "Bacon is the side part and the breast, sometimes the belly of the hog smoked,— salted and smoked". Another expert who did not examine the sample in question tesified that in his opinion bacon consists of the breast piece, sides and belly of the hog cured and smoked. Both the Commonwealth's witnesses united in excluding the neck and jaw or jowl of the hog. Certain charts of the Armour and other packing companies were produced showing various classifications of the flesh of the hog, none of which included the neck and jowl as appropriate parts for bacon.

Defendant on his part contended that bacon is a generic term including flesh of the hog taken from various parts of the body but given what is known as a bacon cure. Four experts were called on behalf of defendant who testified that in their opinion the article in question was bacon. Thus emerges the issue of fact which is in dispute in this case.

It is not exact to say that the only material point in dispute is whether the neck and jowl of the hog may be treated so as to become bacon. This is to state only a portion of the problem. The precise question for determination is: Was defendant at the time he sold this package marked "Plymouth Brand Bacon", under the circumstances disclosed by the evidence, guilty of selling an article which was an imitation of another or misbranded as that term is defined in the act of assembly?

The question is an interesting one. If we were to determine what ought to be called bacon we would be inclined to agree with the definition of the term by the experts for the Commonwealth. There are plenty of names available, and we would like to say let the term "bacon" be reserved for those long slabs of meat from the side of the hog which in fragrant and delectable slices adorn so many breakfast tables or fry so temptingly above so many camp fires. Our task however is not so easy. The side meat makes the best bacon; but is it a crime to cure the neck

and jowls as bacon and call it by that name? The evidence discloses that for more than 20 years portions of the neck and jowl of the hog have been cured by the bacon process and sold as bacon butts or bacon squares. It appears indeed that Armour and Company formerly called the article "bacon squares", but that in recent years it has termed the product "Plymouth Brand Bacon". Are these squares or butts an imitation of or misbranded as bacon when they are sold as "Plymouth Brand Bacon"? It should be stated here that there is no contention that this article was sold for the same price or was represented as ordinary bacon. The evidence discloses that it was about 12 cents per pound cheaper and, although not having the high qualities of bacon made from side meat, was nevertheless very useful, particularly in cooking articles with bacon.

On the part of defendant, various definitions of the term "bacon" by dictionaries or encyclopedias were offered. In Webster's Unabridged Dictionary, published in 1864, bacon is defined as "Hog's flesh salted or pickled and dried, usually in smoke". The Standard Dictionary of 1894 defines bacon as "The salted and dried or smoked flesh of the hog, especially the back and sides". Webster's New International Dictionary, published in 1909, defines bacon as: "The back and sides of a pig salted and smoked; formerly, the flesh of a pig salted or fresh; pork." The Twentieth Century Dictionary, printed in 1936, defines bacon as: "Hog's flesh, especially the back and sides, salted or pickled and dried, usually in smoke." The Encyclopædia Britannica (14th ed.) vol. II, published in 1929, gives a comprehensive definition of bacon: "The smoked meat product which is prepared from the sides, belly or back of hogs. A variety of bacon known as 'bacon squares', which is used chiefly in cooking (as a garnish or flavoring agent), is prepared from the jowls. In the British trade, bacon ordinarily consists of the entire side or half of the hog, or the half with only the shoulder end removed. In the United States, bacon for the domestic trade consists of the smaller cuts previously mentioned."

In line with the definition of the Encyclopædia Britannica, heretofore quoted, it appears that "Wiltshire Bacon", which is prepared for the English trade, consists of the entire half of the hog salted, cured, and smoked; Cumberland bacon consists of the entire side of the hog with the exception of the shoulder, similarly treated; Canadian bacon consists of the loin meat of the hog cured according to the bacon process.

All of this evidence indicates that the term bacon as it has been widely used does not have a fixed and certain meaning. It does not indicate that one may deviate from one precise meaning at his peril. Some effort was made on the part of the Commonwealth to show that a definition of bacon had been formulated by the Pennsylvania Department of Agriculture pursuant to section 8 of the Pure Food Act, supra. Clarence M. Krug, State chemist, testified that he had participated in a conference where a definition of bacon was evolved. This evidence was received because it might throw light on the way the term bacon has been understood in the trade; but no binding force of law can be contended for it. There was no proof of any rule or regulation of the Secretary of Agriculture. There was no proof that any such rule or regulation had been "published in the official bulletin in the issue immediately following the publication of the same", as required by the statute. The case of the Commonwealth, both legally and ethically, would be much stronger if it could show that the Department of Agriculture had formulated a definite rule under this statute defining what is to be classed as bacon. Had it done so, defendant would have had some opportunity of knowing to what rule he was expected to adhere. This is altogether different from the present situation, where the Commonwealth seeks to determine from a number of uses of the term bacon that one which is preferable, and to impose criminal liability for any deviation therefrom.

The observations heretofore made are sufficient in our opinion to decide this case in favor of defendant. As we

have said, the better and more logical method would be to limit the term bacon to the cuts from the back, sides, and belly; but when we are asked to decide under the facts in this case that the citizen has been guilty of criminal conduct by using the term bacon in a more general sense we decline to do so. Bacon butts or squares is certainly more accurate, but even this term is assailed in other prosecutions brought contemporaneously with this. The case is at least very doubtful, and defendant is entitled to the benefit of the doubt.

There is another feature of the case that merits careful consideration. Calling attention to it at this time may assist the officers who are charged with the enforcement of our pure food acts in evolving a proper and adequate procedure to govern this matter. It was proved in this case that the bacon, sold in a sealed cellophane wrapper, bore the "inspected and passed" stamp of the Bureau of Animal Industry of the United States Department of Agriculture, and a further trade label marked "Plymouth Brand Bacon". This label was approved by the bureau on April 26, 1930. A previous label in substantially the same form had been approved by the same authority on November 20, 1923, and also on February 27, 1923. A label marked "Plymouth Brand Bacon Butts" was approved on two occasions in 1915. These labels were approved pursuant to the authority conferred by the Act of Congress of March 4, 1907, 34 Stat. at L. 1256, 1262, 21 U. S. C. §§75, 89. This act, after prohibiting the transportation in interstate commerce of any meat or meat food product not inspected, examined, and marked "inspected and passed", in accordance with the rules and regulations prescribed by the Secretary of Agriculture, and after providing that when any meat product has been so inspected and passed a label to that effect shall be attached to the container or covering under the supervision of the inspector, further provides:

"No such meat or meat food products shall be sold or offered for sale by any person, firm, or corporation in

interstate or foreign commerce under any false or deceptive name; but established trade name or names which are usual to such products and which are not false and deceptive and which shall be approved by the Secretary of Agriculture are permitted."

Under the interstate commerce clause of the Federal Constitution, Congress has the right to require inspection of meat products passing into interstate commerce and to provide for labels to make this inspection effective. No State statute can be permitted to interfere with or impose burdens or conditions upon the regulation of interstate commerce by the Congress: McDermott v. State of Wisconsin, 228 U. S. 115. This does not mean that the State Government may not in a proper case adopt regulations under its police power for the proper protection of the health of its citizens.

These twin principles have been the subject of extensive discussion by the Supreme Court of the United States. In Price v. People of the State of Illinois, 238 U. S. 446, the Illinois statute forbade the sale of preservatives containing boracic acid. It was upheld even as applying to sealed packages of food shipped in from another State, but there was no Federal regulation covering the matter, as in the McDermott case. The benzoate of soda cases establish a similar ruling: Weigle v. Curtice Brothers Co., 248 U. S. 285. In The Hebe Co. et al. v. Shaw, etc., 248 U. S. 297, an Ohio statute was upheld which forbade the sale of condensed milk unless made from whole unadulterated milk. The Hebe Company produced a product made from evaporated skim milk and cocoanut oil. It was held that although the product was admittedly wholesome the State could forbid its manufacture and sale even in interstate commerce no matter how it was labeled and what it was called. In Crowl v. Commonwealth of Pa., 242 U. S. 153, affirming Commonwealth v. Crowl, 245 Pa. 554, a Pennsylvania statute was upheld which forbade the sale of adulterated ice cream. Ice cream was described as adulterated, inter alia, when it contained

less than a certain percentage of butter fat. In this case also no question of interstate commerce was involved.

The case becomes more difficult when there are both Federal regulations and State regulations covering the same matter. The McDermott case establishes that if the two conflict the Federal regulation must control. The case of Corn Products Refining Co. v. Eddy et al., 249 U. S. 427, establishes that Federal regulation does not necessarily preclude State regulation. In that case a product was sold under the name of "Mary Jane", the label containing a statement that it was a table syrup prepared from corn syrup, molasses, and pure country sorghum. This label was approved under the Federal pure food act. The Kansas statute required the proportion of such ingredients to be shown on the package. The Supreme Court sustained the Kansas statute, in effect allowing both labels to be required, and distinguishing the McDermott case because of the fact that in the McDermott case the Wisconsin statute required the removal of the Federal label.

In the case now before us we are concerned not with the pure food acts but with the Federal meat inspection law. The acts, however, rest upon the same principles. The power given the Secretary of Agriculture under the latter act to inspect meat and to approve labels was sustained in Brougham et al. v. Blanton Mfg. Co., 249 U. S. 495, and Houston et al. v. St. Louis Independent Packing Co., 249 U. S. 479.

Accordingly, we have the determination by a proper authority acting under a Federal statute that, as far as interstate commerce is concerned, the product in question was properly labeled "Plymouth Brand Bacon". Presumably this finding represents the settled judgment of Congress, which must consider the interests of all sections of the country and prevent what Mr. Justice Cardozo calls economic isolation. The regulations in question are intended to apply to all States where the name

"bacon" may be used with many connotations. Can the State of Pennsylvania declare that although this product is bacon in interstate commerce it is not bacon in the State of Pennsylvania? Can it enforce the removal of the Federal label? Without deciding this question in its full implication, we are definitely of the opinion that the State cannot do so in this present case by a general statute which neither by act of the legislature nor rule of the Secretary of Agriculture defines what is meant by the term "bacon".

"The citizen cannot be held to answer charges based upon penal statutes whose mandates are so uncertain that they will reasonably admit of different constructions. A criminal statute cannot rest upon an uncertain foundation. The crime, and the elements constituting it, must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to pursue. Penal statutes prohibiting the doing of certain things, and providing a punishment for their violation, should not admit of such a double meaning that the citizen may act upon the one conception of its requirements and the courts upon another": Connally, Commissioner, et al. v. General Const. Co., 269 U. S. 385, 393.

We have delayed the filing of this opinion for some time awaiting a brief from the office of the district attorney or the Attorney General, which has never been furnished. Relying upon a brief from defendant and our own researches we have concluded that defendant is not guilty. The prosecution is, nevertheless, in the public interest and discloses the laudable purpose to defend the people from imposition in the matter of their food. For this reason we place the costs upon the county. All of the witnesses for the Commonwealth were paid employes and for this reason we do not allow witness fees.

### Verdict

Now, January 15, 1937, I, W. Walter Braham, the trial judge before whom the above-entitled case was tried with-

out a jury pursuant to agreement of the parties, under the Act of June 11, 1935, P. L. 319, do hereby find defendant in the above-entitled case not guilty, and place the costs upon the County of Lawrence. No costs, however, to be allowed to witnesses for the Commonwealth.